*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

JOSHUA MICHAEL ROSEBUSH,

Defendant-Appellant.

UNPUBLISHED
January 20, 2022

No. 352127
Saginaw Circuit Court
LC No. 19-045946-FC

Before: O'BRIEN, P.J., and STEPHENS and LETICA, JJ.

PER CURIAM.

Defendant appeals as of right his jury trial convictions of (1) assault with intent to murder (AWIM), MCL 750.83; (2) assault with intent to do great bodily harm less than murder (AWIGBH), MCL 750.84; (3) three counts of unlawful driving away of an automobile (UDAA), MCL 750.413; (4) assaulting, resisting, or obstructing a police officer, MCL 750.81d(1); (5) carrying a weapon with unlawful intent, MCL 750.226; (6) receiving and concealing a stolen firearm, MCL 750.535b; (7) being a felon in possession of a firearm (felon-in-possession), MCL 750.224f; and (8) nine counts of possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b. He was sentenced, as a fourth-offense habitual offender, MCL 769.12, to imprisonment as follows: (1) 75 to 115 years for AWIM, (2) 152 months to 90 years for AWIGBH, (3) three terms of 76 months to 90 years for UDAA, (4) 46 months to 15 years for assaulting, resisting, or obstructing a police officer, (5) 76 months to 90 years for carrying a weapon with unlawful intent, (6) 76 months to 90 years for receiving and concealing a stolen firearm, (7) 58 months to 90 years for felon-in-possession, and (8) nine terms of 2 years for felony-firearm. We affirm defendant's convictions and sentences, but remand this case for the ministerial task of correcting an error in the amended judgment of sentence.

## I. BASIC FACTS AND PROCEDURAL HISTORY

The prosecutor presented evidence that defendant was on parole, absconded, and stole a vehicle with a handgun in it. The 18 convictions on appeal arose from *subsequent* events, which occurred between January 21, and January 22, 2019. Initially, defendant stole a white Dodge Ram, forgot to turn on the headlights, and was pulled over by Saginaw Police Officer Jeff Koenig. The

-1-

vehicle had not been reported as stolen, and Officer Koenig only intended on advising defendant to turn his headlights on. However, when Koenig reached the driver's side door, defendant said, "nighty night," and shot him in the face with the stolen handgun. As Koenig retreated to the back of the vehicle, defendant shot him again in the shoulder. Officer Koenig incurred very serious injuries, but managed to fire two rounds at defendant's stolen vehicle.

In Saginaw, defendant abandoned the Dodge Ram and stole a white Ford truck with a business decal on the side. He dropped the white Ford truck off at a Home Depot in Genesee County and walked to a gas station parking lot, where he stole a large white van. He drove this van west into Shiawassee County. Shiawassee County Detective Lieutenant Steven Shenk was patrolling I-69, looking for the suspect, when he located defendant driving the van on the expressway and followed him in an unmarked car. Defendant suddenly exited the expressway at Woodbury Road and eventually ended up in a ditch. Detective Lieutenant Shenk attempted to arrest defendant and later shot defendant in self-defense. Defendant was shot in the jaw and the shoulder and was taken into custody with the aid of police backup.

Defendant was transported to Sparrow Hospital where he was in stable condition before undergoing surgery. There, defendant declined pain medication, but gave a statement admitting to the police officer shooting and subsequent actions taken to avoid being taken into custody. In addition to the police statement, defendant left DNA (deoxyribonucleic acid) and fingerprint evidence in the vehicles and items found therein. Further, defendant made various statements regarding the shooting of a police officer to treating medical personnel. Defendant was charged with the various vehicle thefts, assaults, and related offenses that took place in Saginaw, Genesee, and Shiawassee Counties.

## II. MOTION TO SUPPRESS

Defendant alleges that the trial court should have granted his motion to suppress the incriminating statements he made at Sparrow Hospital to Michigan State Police Detective Sergeant David Rivard. We disagree.

At the hospital, defendant first exercised his right to an attorney, but later initiated a new conversation with the police and waived his *Miranda*[1] rights. The appellate court reviews "a trial court's factual findings in a ruling on a motion to suppress for clear error. To the extent that a trial court's ruling on a motion to suppress involves an interpretation of the law or the application of a constitutional standard to uncontested facts, our review is de novo." *People v Attebury*, 463 Mich 662, 668; 624 NW2d 912 (2001).

A person has the constitutional right to counsel during a custodial interrogation. *People v Tanner*, 496 Mich 199, 207; 853 NW2d 653 (2014). "Once a suspect invokes his right to remain silent or requests counsel, police questioning must cease unless the suspect affirmatively reinitiates contact." *Id*. at 208. The *Tanner* Court noted that once a suspect requests an attorney, he or she is not subject to further police questioning *unless* the suspect initiates a further conversation with the police. *Id*. at 208-209. The initiation of a further conversation must indicate the accused's

---

[1] *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

desire to discuss, in general terms, the circumstances of the crime or crimes at issue. *People v McRae*, 469 Mich 704, 716; 678 NW2d 425 (2004). Incriminating statements made afterward can then be used against an accused at trial if the totality of the circumstances show that the defendant has chosen to waive his *Miranda* rights. See *Tanner*, 496 Mich at 209; *People v Clark*, 330 Mich App 392, 419-420; 948 NW2d 604 (2019); *People v Kowalski*, 230 Mich App 464, 473-474; 584 NW2d 613 (1998).

In the present case, evidence was presented that defendant was given *Miranda* warnings; invoked his right to counsel; subsequently initiated further conversations with the police; was again given *Miranda* warnings; and then chose to waive the *Miranda* rights and speak with the police about the criminal incidents. Michigan State Police Trooper Christopher Kane denied that he initiated any conversation with defendant before defendant requested to speak with Detective Sergeant Rivard after he left the room. Michigan State Police Detective Sergeant Brian Russell also testified that defendant told Detective Sergeant Rivard that he wanted to speak "about the incident" and that, thereafter, Detective Sergeant Rivard turned on his recording device and read the *Miranda* rights. The recording reflects the recitation of the rights.

The trial court's factual finding that it was *defendant* who initiated the subsequent conversation with the police, after the initial invocation of the right to counsel, was not clearly erroneous in light of the evidence presented. *Attebury*, 463 Mich at 668. In addition, *Tanner*, *McRae*, *Clark*, and *Kowalski* make clear that if *the suspect*, after first invoking *Miranda*, initiates a general conversation about the criminal incident with the police, chooses to waive his or her rights, and makes an incriminating statement, such a statement is admissible.

Nonetheless, citing *People v Daoud*, 462 Mich 621; 614 NW2d 152 (2000), and *People v Cipriano*, 431 Mich 315; 429 NW2d 781 (1988), defendant contends that his waiver of rights and his confession were involuntary on the basis of the short period between invocation of the right to counsel and the waiver, his medical condition, and the presence of police officers in his hospital room. The *Daoud* Court addressed waiver:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived. [*Daoud*, 462 Mich at 633 (quotation marks and citation omitted).]

In *Cipriano*, 431 Mich at 334, the Court stated:

> In determining whether a statement is voluntary, the trial court should consider, among other things, the following factors: the age of the accused; his lack of education or his intelligence level; the extent of his previous experience with the police; the repeated and prolonged nature of the questioning; the length of the detention of the accused before he gave the statement in question; the lack of any advice to the accused of his constitutional rights; whether there was an unnecessary

delay in bringing him before a magistrate before he gave the confession; whether the accused was injured, intoxicated or drugged, or in ill health when he gave the statement; whether the accused was deprived of food, sleep, or medical attention; whether the accused was physically abused; and whether the suspect was threatened with abuse.

The *Cipriano* Court added, "The absence or presence of any one of these factors is not necessarily conclusive on the issue of voluntariness. The ultimate test of admissibility is whether the totality of the circumstances surrounding the making of the confession indicates that it was freely and voluntarily made." *Id*.

There is no basis from which to conclude that the waiver or the confession was involuntary. A physician's assistant and treating nurse assessed defendant and "gave him a numeric score which helps . . . [provide] an objective way to describe [a patient's] neurologic status." Defendant received the highest score, 15. This score "entailed [documenting] that he was opening his eyes spontaneously, his verbal response was clear and oriented, and his motor response was obeying commands appropriately." Defendant answered questions logically. In her contact with defendant, the physician's assistant asserted that he did not complain of any pain. Additionally, the treating medical personnel testified that the drugs, such as antibiotics, that defendant was given do not alter a person's mental status. It was noted that defendant was not given pain medication because he refused it. Despite this refusal, defendant appeared "[a]lert and oriented" and that he "knew where he was, who he was, why he was there." The nurse stated that defendant's condition was classified as "stable" as he awaited surgery and that she had no problem understanding him.

Detective Sergeant Rivard testified that defendant "appeared coherent" and that he "knew where he was [and] what was going on." He noted that defendant was responding logically to questions. Although defendant did "indicate a couple times that the wrap around his head was very tight," the detective did not recall defendant complaining of any pain aside from seeming to want his bandage loosened. The medical staff did not want to loosen it because it was being used to minimize bleeding. Detective Sergeant Rivard stated that defendant's "demeanor and nature" seemed the same throughout the interview. Also, there was no evidence that defendant was subject to any coercion whatsoever in relation to his decision to initiate a further conversation with the police.

The evidence reveals that the trial court's finding of voluntariness was proper, and under all the circumstances and applicable caselaw, the trial court did not err by denying defendant's motion to suppress the interview that took place between Detective Sergeant Rivard and defendant.

### III. DISMISSAL OF JURORS FOR CAUSE

Defendant asserts that the trial court erroneously dismissed several jurors for cause merely on the basis of their having had misdemeanor criminal convictions. We disagree.

In general, whether to excuse a juror for cause is within the trial court's discretion. *People v Eccles*, 260 Mich App 379, 382-383; 677 NW2d 76 (2004); see also *People v Mahone*, 294 Mich App 208, 215; 816 NW2d 436 (2011) ("The trial court's decision whether to remove a juror is reviewed for an abuse of discretion."). To the extent this issue involves the interpretation of a

court rule, however, review is de novo. *Eccles*, 260 Mich App at 382. Defendant also contends that the procedure followed by the trial court resulted in a violation of defendant's constitutional right to be tried by an impartial jury drawn from a fair cross-section of the community. This constitutional issue is not preserved. This Court reviews unpreserved issues for plain error affecting substantial rights. *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999); see also *Eccles*, 260 Mich App at 385. Under the plain-error doctrine, reversal is warranted if a "clear or obvious" error occurred that "affected the outcome of the lower court proceedings." *Carines*, 460 Mich at 763. And even if this standard is satisfied,

> an appellate court must exercise its discretion in deciding whether to reverse. Reversal is warranted only when the plain, forfeited error resulted in the conviction of an actually innocent defendant or when an error seriously affected the fairness, integrity or public reputation of judicial proceedings independent of the defendant's innocence. [*Id*. at 763 (citation, quotation marks, and brackets omitted).]

MCR 2.511 states, in part:

> **(D) Challenges for Cause.** The parties may challenge jurors for cause, and the court shall rule on each challenge. A juror challenged for cause may be directed to answer questions pertinent to the inquiry. It is grounds for a challenge for cause that the person:
>
> * * *
>
> (10) is or has been a party adverse to the challenging party or attorney in a civil action, or has complained of or has been accused by that party in a criminal prosecution[.]

In *Eccles*, 260 Mich App at 385-386, the Court stated:

> Initially, we note that it is not disputed that the prospective jurors at issue here had each been the subject of misdemeanor criminal prosecutions, a fact that, as discussed above, constitutes a proper ground for a prosecutorial challenge for cause under MCR 2.511(D)(11).[2] A proper ground for a challenge for cause having been shown, the trial court was without discretion to retain these individuals regardless of whether they asserted an ability to be fair and impartial.

*Eccles* demonstrates that the trial court did not err by dismissing the jurors in question.

Defendant contends that *Eccles* conflicts with statutory law because misdemeanor convictions do not disqualify persons from jury service under MCL 600.1307a. Presumably, he is referring to the fact that that statute states that a person, to be qualified as a juror, must "[n]ot have been convicted of a felony." MCL 600.1307a(1)(e). However, the relevant language from MCL 600.1307a(1)(e) was in effect at the time *Eccles* was issued on January 20, 2004, see 2002

---

[2] Current MCR 2.511(D)(10) was, at the time of *Eccles*, delineated as MCR 2.511(D)(11).

PA 739, so presumably the Court was aware of the language. In addition, MCL 600.1355 states, "With respect to the selection and impaneling of jurors, any examination, challenge, replacement, oath or other practice *not otherwise governed by the provisions of this chapter* shall be governed by rules adopted by the supreme court." (Emphasis added.) Challenges on the basis of misdemeanor convictions are not governed by the chapter.[3]

*Eccles* is binding on this Court under MCR 7.215(J)(1) ("A panel of the Court of Appeals must follow the rule of law established by a prior published decision of the Court of Appeals issued on or after November 1, 1990, that has not been reversed or modified by the Supreme Court, or by a special panel of the Court of Appeals as provided in this rule."). In addition, defendant has not set forth a convincing reason for calling for a conflict panel.

As noted, defendant also raises a fair-cross-section claim. "The right to a fair trial under the Sixth Amendment of the federal constitution requires that juries be drawn from a fair cross-section of the community." *Eccles*, 260 Mich App at 385. In *Eccles*, *id*. at 385-386, the Court stated that the defendant's unpreserved fair-cross-section argument was not viable under the plain-error doctrine because the court had properly excused the jurors in question under MCR 2.511. The same conclusion is appropriate in the present case. In addition, in *Eccles*, *id*. at 386, the Court went on to state that the defendant had not demonstrated that the excluded jurors were African-American, in support of the defendant's fair-cross-section claim. Here, defendant does not even explain in what way his jury did not represent a fair cross-section of the community.[4] No basis for reversal is apparent.

## IV. SEVERANCE OF CHARGES

Defendant submits that the alleged offenses occurring in Saginaw, Genesee, and Shiawassee Counties should have been tried in the respective counties and that the trial court erred by denying defendant's motion to sever the charges. We disagree.

This Court reviews for an abuse of discretion a trial court's decision to deny a motion for severance. *People v Girard*, 269 Mich App 15, 17; 709 NW2d 229 (2005). However, the threshold question of whether offenses are "related" under the court rules is reviewed de novo. *Id*. "An

---

[3] Defendant also cites *People v Miller*, 482 Mich 540, 552; 759 NW2d 850 (2008), for the proposition that the mere fact of a conviction is not sufficient to show that a juror is biased. That case is distinguishable, however, because in *Miller*, the *defendant* was asserting that a convicted person should not have sat on his jury. *Id*. The Court said, "Having been previously convicted of similar offenses, the juror, if anything, likely would have been sympathetic towards defendant." *Id*. at 554. With regard to the language from what is now enumerated as MCR 2.511(D)(10), the Court emphasized that the juror had not complained of or been accused by *the defendant* in a criminal prosecution. *Id*. at 552 n 14. In the present case, the potential jurors in question had been accused by the challenging party, i.e., the prosecuting authority, in a criminal prosecution. MCL 2.511(D)(10).

[4] Defendant is Caucasian.

abuse of discretion occurs . . . when the trial court chooses an outcome falling outside th[e] principled range of outcomes." *People v Babcock*, 469 Mich 247, 269; 666 NW2d 231 (2003).

MCR 6.120, which deals with multiple charges against a single defendant, states, in part:

**(B) Postcharging Permissive Joinder or Severance.** On its own initiative, the motion of a party, or the stipulation of all parties, except as provided in subrule (C), *the court may* join offenses charged in two or more informations or indictments against a single defendant, or *sever offenses charged in a single information or indictment against a single defendant, when appropriate to promote fairness to the parties and a fair determination of the defendant's guilt or innocence of each offense*.

(1) *Joinder is appropriate if the offenses are related*. For purposes of this rule, offenses are related if they are based on

(a) the same conduct or transaction, or

(b) a series of connected acts, or

(c) a series of acts constituting parts of a single scheme or plan.

(2) Other relevant factors include the timeliness of the motion, the drain on the parties' resources, the potential for confusion or prejudice stemming from either the number of charges or the complexity or nature of the evidence, the potential for harassment, the convenience of witnesses, and the parties' readiness for trial.

\* \* \*

**(C) Right of Severance; Unrelated Offenses.** On the defendant's motion, the court must sever for separate trials offenses that are not related as defined in subrule (B)(1). [Emphases added.]

It is patently apparent that the charges at issue in this case were a series of connected acts. MCR 6.120(B)(1)(b). Indeed, the offenses were a continuous series of actions involving car thefts, assaults, and attempts to evade arrest during the night of January 21, 2019, and the first half of the day on January 22, 2019. In fact, in his appellate brief defendant focuses on MCR 6.120(B)(1)(c) and argues that there was no single scheme or plan that day, but the trial court concluded that the charges were "a series of connected, continuous acts *and/or* a series of acts constituting parts of a single scheme or plan." Defendant does not contest this basis of the trial court's ruling. Moreover, the offenses did all relate to a common plan: a plan to evade capture by authorities, by continuously stealing different automobiles and using a firearm. There is no ground for appellate relief with regard to the question concerning whether the offenses were related.

Defendant alleges that the court should have nevertheless severed the offenses under MCR 6.120(B)(2) because of the potential for juror confusion involving the multiple charges. But the charges were set forth in a logical, sequential order and were not particularly difficult to understand; no such danger of juror confusion is apparent. Defendant also submits that prejudice

must be presumed because if the charges were severed, the jurors would not hear about the evidence pertaining to the other counties. But, the jurors would be entitled to hear about the additional charges as part of the overall plan to evade the police. MRE 404(b). From the time defendant absconded from parole, he demonstrated an intent to use various automobiles and evade the authorities. On balance, the court's decision to deny the motion to sever was within the principled range of outcomes. *Babcock*, 469 Mich at 269.

## V. SUFFICIENCY AND GREAT WEIGHT OF THE EVIDENCE

Defendant asserts his conviction of resisting, obstructing, or assaulting Detective Lieutenant Shenk is infirm because there was no evidence that defendant knew that the detective was a police officer. He also contends the conviction of carrying a weapon with unlawful intent is infirm because there was no evidence that defendant "went armed"—i.e., departed a certain location—with the gun *with the intent* to use it unlawfully. He submits that both convictions should be vacated on the basis of insufficient evidence or that a new trial should be granted on these charges because the verdicts were against the great weight of the evidence. We disagree.

"This Court reviews de novo a defendant's challenge to the sufficiency of the evidence supporting his or her conviction." *People v Lane*, 308 Mich App 38, 57; 862 NW2d 446 (2014). This Court reviews for an abuse of discretion a trial court's decision regarding a motion for a new trial brought on the basis of the great weight of the evidence. *People v Gadomski*, 232 Mich App 24, 27-28; 592 NW2d 75 (1998).

In reviewing a sufficiency-of-the-evidence claim, this Court "review[s] the evidence in a light most favorable to the prosecution to determine whether a rational trier of fact could find that the prosecution had proved the crime's elements beyond a reasonable doubt." *Lane*, 308 Mich App at 57. In determining whether the prosecution offered sufficient evidence to support a conviction, direct and circumstantial evidence can be considered. See *People v Hardiman*, 466 Mich 417, 428; 646 NW2d 158 (2002). Moreover, "[i]t is for the trier of fact, not the appellate court, to determine what inferences may be fairly drawn from the evidence and to determine the weight to be accorded those inferences." *Id.* "[A] reviewing court is required to . . . make credibility choices in support of the jury verdict." *People v Nowack*, 462 Mich 392, 400; 614 NW2d 78 (2000). Furthermore:

> The test to determine whether a verdict is against the great weight of the evidence is whether the evidence preponderates so heavily against the verdict that it would be a miscarriage of justice to allow the verdict to stand. Generally, a verdict may be vacated only when the evidence does not reasonably support it and it was more likely the result of causes outside the record, such as passion, prejudice, sympathy, or some other extraneous influence. Conflicting testimony, even when impeached to some extent, is an insufficient ground for granting a new trial. Further, the resolution of credibility questions is within the exclusive province of the jury. [*People v Lacalamita*, 286 Mich App 467, 469-470; 780 NW2d 311 (2009) (quotation marks and citations omitted).]

In the absence of rare exceptions, issues of witness credibility are for the jury. *People v Lemmon*, 456 Mich 625, 642; 576 NW2d 129 (1998). Exceptions occur when the witness's "testimony is

patently incredible or defies physical realities," when "a witness's testimony . . . is so inherently implausible that it could not be believed by a reasonable juror," or when "the . . . testimony has been seriously impeached and the case marked by uncertainties and discrepancies." *Id.* at 643-644 (quotation marks and citations omitted).

To convict a defendant of resisting, assaulting, or obstructing a police officer, see MCL 750.81d, a prosecutor must prove that "(1) the defendant assaulted, battered, wounded, resisted, obstructed, opposed, or endangered a police officer, and (2) the defendant knew or had reason to know that the person that the defendant assaulted, battered, wounded, resisted, obstructed, opposed, or endangered was a police officer performing his or her duties." *People v Quinn*, 305 Mich App 484, 491; 853 NW2d 383 (2014) (quotation marks and citation omitted). Defendant challenges only the knowledge element of the offense.

During defendant's interview with Detective Sergeant Rivard, the detective said the following: "And then that [i.e., Detective Lieutenant Shenk] turned out to be police and did you shoot at that officer as well?" Defendant said, "I tried to." Detective Lieutenant Shenk testified that, as he patrolled I-69, he was driving an unmarked, silvery gray Dodge Charger that did not have a siren, but had lights "inside the grill" and "along the back of the license plate" that could be activated. He explained that he was wearing a suit, a tie, and a trench coat. Detective Lieutenant Shenk said that when he was patrolling, he proceeded next to defendant's vehicle. He further stated, "When my vehicle was probably halfway in the middle of the van, the gentleman driving the van then leaned forward, looked back at my vehicle." Detective Lieutenant Shenk stated that he slowed down, that defendant slowed down as well. Detective Lieutenant Shenk testified that defendant, "came to the exit at Woodbury Road, abruptly turned off on to the exit at a high rate of speed." The detective followed, and defendant disregarded the stop sign at the exit and another four-way stop sign. Detective Lieutenant Shenk later stated that he believed that defendant became aware that he was a police officer "once he approached the Woodbury Exit."

Detective Lieutenant Shenk stated that defendant turned into a driveway and "kept leaning over the passenger side area." The officer had been warned that the suspect was armed and dangerous, so he "kept [his] distance" while waiting for backup, but he noticed that defendant would stare toward him and then toward the driveway. Defendant then "backed across the northbound lane and went into the ditch with his back tires," and got stuck. He was partially blocking the roadway. The detective activated the lights on his vehicle, stood by his door, pointed his gun at defendant, and "started giving him loud, verbal commands to put his hands up." Defendant "eventually put his hands straight up on the top of the inside of the van," but then "abruptly jumped out of the driver's side door." The detective went to radio central dispatch to advise that defendant was likely to be running on foot when defendant "jumped out from the driver's side corner panel very quickly and crouched down in a very low position." Detective Lieutenant Shenk said that defendant pointed a gun at him and possibly fired at him. Backup arrived, and Detective Lieutenant Shenk exited his vehicle and gave defendant loud commands to get on the ground. Defendant did not do so but instead kept walking toward the officer.

All this evidence amply supported that defendant knew or at the very least should have known that Detective Lieutenant Shenk was a police officer at the time he resisted him. As stated in *People v Kanaan*, 278 Mich App 594, 622; 751 NW2d 57 (2008), "With regard to the argument concerning knowledge, because it can be difficult to prove a defendant's state of mind on issues

such as knowledge and intent, minimal circumstantial evidence will suffice to establish the defendant's state of mind, which can be inferred from all the evidence presented." The conviction under MCL 750.81d was supported by sufficient evidence and was not against the great weight of the evidence.

To convict a defendant of carrying a weapon with unlawful intent, see MCL 750.226,[5] "the prosecution must prove beyond a reasonable doubt that the accused (1) went armed—while possessing a firearm or other dangerous weapon, moved from one location to another location— and (2) at the time of going armed, had the intent to use the weapon unlawfully against another person." *People v Ackah-Essien*, 311 Mich App 13, 22; 874 NW2d 172 (2015). Defendant challenges only the intent element of the offense.

The charged crime under MCL 750.226 referred to all three counties for that offense. Accordingly, the question is whether defendant, during at least one of the times of "going armed," had the intent to use the gun unlawfully against another person. Again, "[m]inimal circumstantial evidence is sufficient to prove an actor's state of mind." *People v Fennell*, 260 Mich App 261, 270-271; 677 NW2d 66 (2004). The entire sequence of events, beginning with defendant's absconding from parole and admitted desire to be away from the authorities, must be considered. After defendant was pulled over by Officer Koenig and shot him in the face, defendant "switched out" his choice of stolen vehicle two more times. A reasonable inference from this switching of vehicles was that he was attempting to evade the police. In addition, each time he switched vehicles, he took the affirmative action of keeping the gun with him. Then, he attempted to shoot Detective Lieutenant Shenk when the detective was attempting to arrest him. Again, "[i]t is for the trier of fact, not the appellate court, to determine what inferences may be fairly drawn from the evidence and to determine the weight to be accorded those inferences." *Hardiman*, 466 Mich at 428. The question, for sufficiency-of-the-evidence purposes, is whether a reasonable juror *could have found* that the prosecutor proved the intent element beyond a reasonable doubt. We conclude that the evidence as a whole did, in fact, allow such a finding. In addition, we conclude that the trial court did not abuse its discretion by deciding that the conviction under MCL 750.226 was not against the great weight of the evidence; the evidence did not preponderate so heavily against the guilty verdict such that it would be unjust to allow the conviction to stand. *Lacalamita*, 286 Mich App at 469.

## VI. JUDICIAL IMPROPRIETY

Defendant asserts that the trial judge should have recused himself in connection with a $50 donation he made to a GoFundMe effort for Officer Koenig. In light of defendant's waiver of this issue, we disagree.

At a pretrial hearing, the trial judge stated:

---

[5] MCL 750.226(1) states that "[a] person shall not, with intent to use the same unlawfully against the person of another, go armed with a pistol or other firearm, or a pneumatic gun, dagger, dirk, razor, stiletto, or knife having a blade over 3 inches in length, or any other dangerous or deadly weapon or instrument."

-10-

I wanted to address something on the record. I'm not sure it has been addressed on the record. The defense counsel has raised the issue with regard to some of his arguments about the GoFundMe page and the public sentiment. I want to—I've made this disclosure to the counsel privately, but I haven't done it on the record and I want to do so. I want to make it clear, though, so bear with me.

I contributed, I think, $50.00 to the GoFundMe effort when I found out that the officer was shot. And I did so without any knowledge about the circumstances, other than general media reports. And I also want to tell you I really haven't seen much media on this case. The reason—one of the reasons I did so, again in full disclosure, is that I . . . know a person named Patricia Koenig, who I know many people know in this . . . area because she was a Realtor and did business in Saginaw . . . for many years. I . . . know her. I went to high school with her daughter. She is a friend. This is how much I guess I know her. I didn't know whether Officer Koenig, and . . . I'll tell you what, I forgot his name already.

The prosecutor said that Officer Koenig's first name was Jeff. The judge then said:

I didn't realize whether Jeff was her son or a relative, and just kind of playing it safe, if he were a son, I would want to do that to show my concern. Turns out Jeff Koenig is, I think, a nephew or something, I don't even know for sure . . . but it's not a son. I don't know Jeff Koenig. I wouldn't know him if I . . . saw him. So I have no personal knowledge, I have no personal relationship with Mr. Koenig, but I did contribute $50.00 to the GoFundMe in a very general way, again thinking that maybe he was the son of Mrs. Koenig who I do know.

Other than that, I've had absolutely no contact with anyone from Saginaw Township Police or anyone else about this matter.

\* \* \*

I certainly, I want to make it very clear, I have absolutely no prejudice in this case, I don't think. And I have reviewed, specific to this circumstance, my ethical obligations and my canons and my code of conduct. There's nothing, based on my review of that, that would render me incapable or unable to preside over this trial. But I wanted to make this disclosure in the event someone wants to file a motion. I didn't anticipate that, but [sic] having talked to you about it privately, but I did want to make the disclosure so that everyone understands why it was made.

Despite being apprised of this donation, defendant did not move for disqualification of the trial court. Waiver is the "intentional relinquishment or abandonment of a known right." *People v Kowalski*, 489 Mich 488, 503; 803 NW2d 200 (2011). A defendant who waives his rights under a rule may not seek appellate review of a claimed deprivation of those rights because the waiver extinguished any error. *Id*. When the trial court inquires if a party has any objections and the party responds negatively, it constitutes an approval of the trial court's actions. See *People v Miller*,

-11-

326 Mich App 719, 726; 929 NW2d 821 (2019). Accordingly, defendant waived appellate review of this issue.[6]

Alternatively, defendant contends that his trial attorney rendered ineffective assistance of counsel by failing to file a disqualification motion. To obtain relief on the basis of ineffective assistance of counsel, a party "must show that counsel's performance fell short of [an] . . . objective standard of reasonableness and that, but for counsel's deficient performance, there is a reasonable probability that the outcome of the . . . trial would have been different." *People v Ackley*, 497 Mich 381, 389; 870 NW2d 858 (2015) (quotation marks, citation, and brackets omitted). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* (quotation marks and citation omitted). A defendant must overcome a strong presumption that counsel's actions were based on sound trial strategy. *Id.* at 388.

On the existing record, there is nothing to overcome the strong presumption that counsel's actions were based on sound trial strategy. *Id.* It is entirely possible that counsel viewed the judge as a more favorable choice than other judges who could be assigned to the case in the event of disqualification. In addition, given that the judge explained that he did not know Officer Koenig and could be impartial, it did not fall below an objective standard of reasonableness for counsel to fail to file a motion, and defendant has not established how there was a reasonable probability that the outcome of his jury trial was affected by virtue of the judge's remaining on the case. *Id.* at 389.

## VII. SENTENCING

Defendant contends that even though the sentence of 75 to 115 years for AWIM fell within the guidelines range, it was unreasonable and disproportionate.

A sentence *departing from the guidelines range* is reviewed by this Court for reasonableness. *People v Lockridge*, 498 Mich 358, 392; 870 NW2d 502 (2015). "[T]he proper inquiry when reviewing a sentence for reasonableness is whether the trial court abused its discretion by violating the principle of proportionality set forth in *People v Milbourn*, 435 Mich 630, 636; 461 NW2d 1 (1990), which requires sentences imposed by the trial court to be proportionate to the seriousness of the circumstances surrounding the offense and the offender." *People v Steanhouse*, 500 Mich 453, 459-460; 902 NW2d 327 (2017) (quotation marks and citation omitted).

Defendant, however, admits that his sentence fell within the guidelines range. MCL 769.34(10) states, in pertinent part, "If a minimum sentence is within the appropriate guidelines sentence range, the court of appeals shall affirm that sentence and shall not remand for resentencing absent an error in scoring the sentencing guidelines or inaccurate information relied

---

[6] Indeed, the trial judge set forth all the circumstances on the record and even invited the parties to file a motion for disqualification should they find it necessary. The judge's open disclosure and explanation regarding his limited knowledge of the circumstances served to avoid the appearance of impropriety.

upon in determining the defendant's sentence." Defendant does not contend that any scoring errors occurred or that the trial court relied on any inaccurate information during sentencing. In *People v Schrauben*, 314 Mich App 181, 196; 886 NW2d 173 (2016), this Court stated:

> When a trial court does not depart from the recommended minimum sentencing range, the minimum sentence must be affirmed unless there was an error in scoring or the trial court relied on inaccurate information. MCL 769.34(10). Defendant does not dispute that his sentence was within the recommended minimum guidelines range, and he does not argue that the trial court relied on inaccurate information or that there was an error in scoring the guidelines. Therefore, this Court must affirm the sentence.

The *Schraubren* Court specifically stated that "*Lockridge* did not alter or diminish MCL 769.34(10)[.]" *Id*. at 196 n 1.[7]

Defendant acknowledges that he was sentenced with the recommended minimum guidelines range, but nonetheless contends that his sentence is not proportionate to the circumstances of the offense and the offender because he engaged in spontaneous acts and Officer Koenig "did not die." He further submits that other individuals received lesser sentences for the same offense, thereby implicating "due process." Defendant shot Officer Koenig in the face, shot him again in the shoulder as defendant retreated behind his stolen vehicle, and then fled the scene. Defendant retained the weapon and stole additional vehicles to evade the authorities. When defendant was cornered by the police, he did not surrender, but attempted to fire the weapon again. Defendant admitted that this multi-county crime spree followed a substantial period of incarceration for property crimes. Thus, defendant was a fourth-offense habitual offender who accelerated his property crimes to accompany deadly force. Under the circumstances, appellate relief is unwarranted.

We do, however, remand this case for the small ministerial task of correcting the September 25, 2020 amended judgment of sentence. While it accurately reflects 18 total convictions and sentences, it sets forth a sentence of 76 months to 90 years for the conviction of

---

[7] We recognize that our Supreme Court has scheduled oral argument, in part, on the questions of "whether the requirement in MCL 769.34(10) that the Court of Appeals affirm any sentence within the guidelines range, absent a scoring error or reliance on inaccurate information, is consistent with the Sixth Amendment, the due-process right to appellate review, and *People v Lockridge*, 498 Mich 358; 870 NW2d 502 (2015); and, if not, [] whether the appellant's sentence is reasonable and proportionate." *People v Posey*, ___ Mich ___; 964 NW2d 362 (2021); *People v Stewart*, ___ Mich ___; 964 NW2d 363 (2021). Under MCR 7.215(J)(1), we are bound to follow *Schrauben*.

felon-in-possession. But the sentencing transcript reflects that the court actually sentenced defendant to 58 months to 90 years for felon-in-possession.

Defendant's convictions and sentences are affirmed but this case is remanded for the ministerial task of correcting the amended judgment of sentence. We do not retain jurisdiction.

/s/ Colleen A. O'Brien
/s/ Cynthia Diane Stephens
/s/ Anica Letica